BABBIT ET AL., APPELLANTS, *v.* PUBLIC UTILITIES
COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Babbit v. Pub. Util. Comm. (1979),
59 Ohio St. 2d 81.]

(No. 78-794—Decided July 18, 1979.)

84

*Mr. R. Michael Frank, Mr. Thomas A. Karol, Mr. Ben David Shiriak* and *Mr. John P. Worcester,* for appellants.

*Mr. William J. Brown,* attorney general, *Mr. Marvin I. Resnik, Mr. Mark C. Sholander* and *Mr. Harris S. Leven,* for appellee.

*Mr. Roger C. Post, Mr. James L. Fullin, Mr. Timothy L. Holston* and *Mr. Thomas E. Morgan,* for intervening appellee Columbia Gas of Ohio.

HOLMES, J. The main issue before this court is raised by appellants' third proposition of law, wherein it is contended that the commission's "* * * failure to include zero-cost components in applicant's capital structure is against the weight of the evidence, unlawful, and capricious."

The "zero-cost components" which appellants argue should have been considered in the cost of capital computation are the accumulated deferred federal income tax account and the accumulated deferred investment tax credit

account. Although other factors may be involved, the accumulated deferred income tax account exists primarily in order to reconcile the corporation's balance sheet, for which long-term assets are depreciated by the straight-line method, with its income tax returns, for which an accelerated depreciation method is utilized. The arithmetic difference between book and tax depreciation is capitalized by the corporation for book purposes. The accumulted deferred investment tax credit account results from the amortization of investment tax credits to "Other income" on the balance sheet.

Appellants contend that these accounts represent the equivalent of interest-free loans to Columbia Gas System, Inc., and, as such, they should be included in its capital structure at a zero cost which would reduce the base for rate-making purposes. Appellants argue further that the commission has, by failing to include zero-cost components in the parent's capital structure, in effect created a hypothetical company such as that condemned by this court in *General Telephone Co*. v. *Pub. Util. Comm*. (1963), 174 Ohio St. 575, 577, and *Cleveland Elec. Illuminating Co*. v. *Pub. Util. Comm*. (1975), 42 Ohio St. 2d 403, 412, certiorari denied (1975), 423 U. S. 986. Appellants reason that by attributing to the company the high cost of capital of the higher-risk nondistribution companies of the Columbia System, without correspondingly attributing to it the tax advantages received by those companies, the commission has artifically inflated the rate of return required by the company.

In response to this argument, the appellee urges that the inclusion of zero-cost components in the parent's capital structure is neither permitted by Ohio law nor supported by the record in this case. In support of its conclusion, appellee relies on *Cleveland Elec. Illuminating, supra,* wherein this court stated in paragraph two of the syllabus that:

"Inclusion of a 'zero component' representing deferred credits in the capital structure of a public utility con-

stitutes an unlawful reduction of the statutory rate base of the utility.''

It is clear that under prior law, the use of zero-cost components in the calculation of the rate of return was forbidden. The real question is whether the changes in rate-making methodology mandated by Am. Sub. S. B. No. 94, effective September 1, 1976, affect the previous prohibition of the use of zero-cost components in setting a fair and reasonable rate of return.

The rate-making procedure under prior statutory law, as interpreted by this court, was set forth in great detail in *Cleveland* v. *Pub. Util. Comm.* (1956), 164 Ohio St. 442, wherein it is stated, at pages 443 and 444, that:

''In a proceeding of this kind, the statutes of this state and the decisions of this court indicate that the Public Utilities Commission must do the following:

''1. Determine the dollar amount as of a date certain of the reconstruction cost new less existing depreciation of the property of the public utility used and useful in rendering the public utility service for which rates are to be fixed. This amount represents and will be referred to herein as the statutory rate base. * * *

''2. Determine what percentage will represent a fair annual rate of return * * * on the property so used and useful in rendering such public utility service, and will thereby represent a yearly 'reasonable compensation for the service rendered.' * * * This percentage will be referred to herein as the rate of return.

''3. Determine the dollar annual return to which the utility is entitled by applying the rate of return percentage against the dollar amount of the statutory rate base. This dollar annual return will be referred to as the dollar amount of return.

''4. Determine the dollar amount of the cost of rendering the public utility service for a particular year. This dollar amount will be referred to herein as the annual expenses.

''5. Add the dollar amount of return (paragraph num-

ber 3) to the annual expenses (paragraph number 4). The resulting figure will be referred to herein as the allowable gross annual revenues.

"6. Fix rates for the service rendered which would have provided the public utility for the particular year (for which its annual expenses were determined in accordance with paragraph 4 above) with an amount equal to such allowable gross annual revenues."

In *Cleveland, supra,* the court went on to explain, at page 444, that:

"* * * [u]nder the Ohio statutes and the decisions of this court, the percentage return is to be related not to the 'total capitalization' or to the 'net investment' but to the statutory rate base (reconstruction cost new less depreciation) so that *neither the actual capital of or net investment in this public utility nor its actual earnings requirements are really material* in a proceeding of this kind." (Emphasis *sic*.)

Thus, under prior law, *Cleveland, supra,* held in effect that the commission was to determine the rate of return by hypothesizing a company with a total capitalization equal to the actual company's statutory rate base and calculating a reasonable rate of return on the fictional capital structure so determined.

However, while the RCNLD statutory rate base mandated this hypothetical corporate structure for purposes of determining a reasonable rate of return, this court forbade the use of the hypothetical company in determining operating expenses. In *General Telephone, supra* (174 Ohio St. 575), the commission established the statutory rate base of the applicant. It then determined a fair and reasonable rate of return based upon the rate base as established. Then, in the computation of allowable rates the commission fictionalized a capital structure for a company having the rate base of the applicant. In determining the applicant's operating expenses, the commission based the allowance for income taxes on the deductions that would be allowable for the interest on the hypothetical

company's fixed debt, rather than on this utility company's actual fixed debt.

This court reversed the order of the commission and held that:

"* * * the commission shall allow, as an item of expense for payment of federal income tax, that amount of dollars which the company is actually required to pay for income tax, under the federal income tax law, upon the annual dollar return which the commission has determined the company is entitled to receive. (*City of Cleveland v. Public Utilities Commission*, 164 Ohio St. 442, at pages 443 and 444, paragraphs numbered 1 through 6 of the *per curiam* opinion, approved and followed.)"

As to the fictionalized structure of the utility for rate-making purposes, the court stated, at pages 578 and 579, that:

"It is apparent that the creation of this 'hypothetical company' has as its ultimate purpose the reduction of the statutory rate base, which is a circumvention of the law of Ohio."

The principle enunciated in *General Telephone, supra*, was again invoked in *Cleveland Elec. Illuminating, supra* (42 Ohio St. 2d 403), in the context of calculating the rate of return. In the latter case, at page 410, the commission based its determination of the rate of return upon " '* * * what a rate of return on book value would do to the market to book ratio of the shares of the Company.' "

As a part of its calculation of rate of return in that case, the commission estimated a proper rate of return for each component of the company's actual capital structure. In so doing, the commission included within the company's capital structure an amount for accumulated deferred investment credits and amortization of pollution abatement facilities. This amount was assigned a zero rate of return, thus reducing the weighted cost of the company's total capitalization.

This court in that case held, in part, that the commission's rate of return methodology was erroneous in failing

to relate the rate of return to the statutory rate base. The court also held, at page 412, that:

"* * * The inclusion of this 'zero component' in the capital structure is similar to the 'hypothetical company' concept which was rejected in *General Telephone Co. v. Pub. Util. Comm.* (1963), 174 Ohio St. 575.

"As did the creation of the 'hypothetical company,' the 'zero component' for deferred credits apparently "* * * has as its ultimate purpose the reduction of the statutory rate base, which is a circumvention of the law of Ohio.' *Ib.*, 174 Ohio St. at 579. Therefore, the Commission erred in including in the rate of return calculation a 'zero component' representing deferred credits."

Although this court compared zero-cost components to the "hypothetical company" in *Cleveland Elec. Illuminating, supra,* the commission had examined the actual capital structure of the public utility in reaching its conclusions in that case. It seems clear that the substantive holding of the case is that the RCNLD rate base may not be reduced by the use of zero-cost components.

Due to legislative enactment of Am. Sub. S. B. No. 94, however, the holding of *Cleveland Elec. Illuminating, supra,* in this regard is no longer the law of Ohio. The RCNLD rate-making methodology has been replaced by an original cost rate base and a method of rate making which permits the examination of the utility's actual capitalization in determining a fair and reasonable rate of return.

In *Franklin Co. Welfare Rights Org. v. Pub. Util. Comm.* (1978), 55 Ohio St. 2d 1, 11, 12, this court acknowledged the intent of the General Assembly to direct the commission to consider the actual experience of the utility for rate-making purposes:

"The General Assembly has recently enacted into law Am. Sub. S. B. No. 94, effective September 1, 1976, wherein Ohio's reconstruction cost new, less depreciation, rate base had been replaced with a net investment, or original cost, rate base. As set forth in R. C. 4909.05 and 4909.15 (A)(1), the new rate base consists of the actual net invest-

ment in the assets of a utility, including the original cost of long term assets [R. C. 4909.05(C),(D),(E),(F) and (G)], less depreciation and contributions of capital [R. C. 4909.-05(H) and (I)], plus short term assets in the form of cash working capital [R. C. 4909.15(A)(1)]. Because under the new rate law the commission is required to relate the 'fair and reasonable rate of return' specified in R. C. 4909.15(A)(2) to the net investment in the utility [see R. C. 4909.15(A)(3)], it is no longer the law in Ohio that the commission may not consider that investment or the total capitalization of the utility in fixing a fair and reasonable rate of return. R. C. 4909.155 specifically authorizes the commission to consider total capitalization in fixing the just and reasonable rates required by Ohio law. As a result, the commission may consider the return on book equity, i. e., the return on the percenatge [sic] of the original cost rate base, financed or capitalized by the sale of common stock, in setting a reasonable rate of return. Similarly, the commission may consider the market-to-book ratio of the utility's stock as an indicator of whether the company is earning, on the equity portion of its original cost rate base, the required return of the equity investor.''.

Under current Ohio law, the rate base as utilized by the commission for the determination of the utility rates is basically founded upon the net investment or original cost evaluation by the commission as of a date certain of the allowable assets of the utility used and useful in rendering the utility service.

Pursuant to R. C. 4909.05 and 4909.15(A)(1), the rate base consists of the actual net investment in the assets of the utility, including the original cost of long term assets, less depreciation and contributions of capital, plus short term assets in the form of cash working capital.

Under the current rate law the commission must also determine a fair and reasonable rate of return to the utility on the evaluation of the assets taking into consideration the net cost to the utility of rendering the public utility service during a 12-month test period.

In determining a fair and reasonable rate of return,

the commission must review the capital structure of the utility and establish the cost to be assessed to each element of that structure including debentures, preferred stock, common equity stock, and other items that may properly be determined to be, and includable in, the capital of the company.

We note that although R. C. 4909.155 does not specifially refer to accumulated deferred income taxes, it does authorize the commission to look at other components of the public utility's capital structure. Further, R. C. 4909.15 (A)(2) requires the commission to determine a "* * * fair and reasonable rate of return to the utility on the valuation as determined in division (A)(1) of this section." It would seem reasonable that if proper in the determination of a "fair and reasonable rate of return," the commission may utilize zero-cost components in its calculation of a utility's capital structure.

There is a wide degree of discretion given the commission under R. C. 4909.05 and 4909.15(A)(1) in the determination of the cost of capital for rate-making purposes. In the reasonable exercise of such discretion, the commission may utilize zero-cost components in its calculation of a utility's capital structure, and such zero-cost components may include deferred taxes and deferred tax credits.

The commission's argument that the only proper method of treating such components is through deductions from the rate base, pursuant to R. C. 4909.05(I) and (J), is not persuasive. Those sections authorize the commission to deduct from total valuation, "[a]ny sums of money or property that the company may have received as total or partial defrayal of the cost of its property." Although these sections may be construed to allow deductions from valuation for zero-cost components, they do not purport to provide an exclusive method of treating such components. In fact, the language of those sections is not entirely apposite to deferred federal income tax, which is retained, rather than "received," by the utility.

Having determined that the commission may include

zero-cost components in a utility's capital structure for arriving at a fair rate of return, the question becomes whether the failure to do so was manifestly against the weight of the evidence, and so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty. *Ford Motor Co.* v. *Pub. Util. Comm.* (1977), 52 Ohio St. 2d 142, 152.

The commission does not seriously argue in this court that the inclusion of the zero-cost components, as suggested by appellants, would cause the utility to lose its right to utilize accelerated depreciation for federal income tax purposes. Although the express rationale for the commission's finding on this point may be erroneous, the commission's finding itself is not against the manifest weight of the evidence.

None of the expert rate of return witnesses who testified in the hearing before the commission utilized zero-cost components in determining rate of return. The only evidence in the record to which appellants refer in support of their assertion is testimony elicited from the staff's rate of return witness upon cross-examination. The staff witness testified that if zero-cost components were not deducted from the rate base, they should be included in the parent's capital structure for purposes of determining rate of return. Considering that the hearings before the commission involved extensive testimony on rate of return by four expert witnesses, we cannot say that the commission's failure to consider zero-cost components in its determination of that matter was against the weight of the evidence.

Appellants' first proposition of law asserts that the commission "* * * must determine the capital structure of a utility for rate-making purposes as of the date certain under R. C. 4909.15(C)."

R. C. 4909.15 provides, in pertinent part, that:

"(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:

"(1) The valuation as of the date certain of the property of the public utility used and useful in rendering the

public utility service for which rates are to be fixed and determined. * * *

"* * *

"(C) The test period, unless otherwise ordered by the public utilities commission, shall be the twelve-month period beginning six months prior to the date the application is filed and ending six months subsequent to that date. The revenues and expenses of the utility shall be determined during the test period. The date certain shall be not later than the date of filing."

R. C. 4909.155(C) allows the commission to require the utility to report:

"(C) The total amount of money received by such utility from the issue of debt and equity securities that are outstanding as of a date certain to be chosen by the commission."

Although both sections refer to "date certain," R. C. 4909 15 speaks to the determination of the rate base valuation, while R. C. 4909.155 refers to the reporting of the utility's capitalization for purposes of calculating the rate of return.

While "[t]he date certain" for valuation purposes must be prior to the date of filing, "a date certain" for rate of return purposes may be chosen by the commission with no apparent statutory limitation. It seems clear that these sections do not refer to the same "date certain."

Appellants contend that "symmetry" requires that valuation and capitalization be determined as of the same date. While that may be true, it ignores the need for basing rate of return calculations on current data. The "fair and reasonable rate of return" referred to in R. C. 4909.15(A)(2) should be prospective. Appellants' contention is without merit.

Finally, appellants propound the following:

"Revised Code Section 4903.09 requires the PUCO to set forth reasons for omitting zero-cost components from applicants' capital structure."

We note again that portion of the commission's order and opinion dealing with this point:

"* * * [B]ased upon the record presented and the Commission's understanding of the elections made * * * inclusion of deferred federal income tax and accumulated investment tax credits in the cost of capital computation at zero cost * * * will result in loss of the deferrals."

This finding is sufficient to satisfy R. C. 4903.09, which requires the commission to set "* * * forth the reasons prompting the decisions arrived at, based upon said findings of fact."

We find the order and opinion of the commission in this cause to be neither unreasonable nor unlawful, and it is hereby affirmed.

*Order affirmed.*

HERBERT, W. BROWN and SWEENEY, JJ., concur.

P. BROWN, J., concurs in paragraphs four and five of the syllabus and in the judgment.

CELEBREZZE, C. J., and LOCHER, J., concur in the judgment only.